UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT BENOIT,

    Plaintiff,

- against -

COMMERCIAL CAPITAL CORPORATION
and NEWTEK SMALL BUSINESS
FINANCE, INC.,

    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/25/08

**OPINION AND ORDER**

03 Civ. 5328 (PKL)

## Appearances

ROBERT J. BARSCH, ESQ.
60 East 42nd Street, Suite 2501
New York, NY 10017

Attorney for Plaintiff

LAW OFFICES OF ROBERT M. BRILL, LLC
Robert M. Brill, Esq.
Anita M. Jaskot, Esq.
880 3rd Avenue, 13th Floor
New York, NY 10022

Attorneys for Defendants

**LEISURE, District Judge:**

Plaintiff, Robert Benoit ("Benoit"), brings this breach-of-contract action against his former employer in light of the latter's refusal, after terminating Benoit, to pay him severance and to allow him to exercise certain stock options. The contract at issue is Benoit's employment agreement, which provided, *inter alia*, circumstances under which Benoit would be eligible for severance and stock options. Defendants, Commercial Capital Corporation ("CCC") and Newtek Small Business Finance, Inc. ("Newtek"), contend that following his termination Benoit was not entitled to severance because he was terminated for cause, and that he was not entitled to stock options because a particular financing transaction was never consummated. Accordingly, defendants move for summary judgment dismissing Benoit's complaint, or alternatively, for partial summary judgment related to the stock-options claim. Defendants additionally seek leave to amend their answer to add counterclaims pursuant to Federal Rule of Civil Procedure 15(a). For the reasons set forth below, defendants' motions are GRANTED IN PART and DENIED IN PART.

## Background

CCC was founded in 1994 by Charles Freeman ("Freeman"), who became the company's Chief Executive Officer and Chairman of the Board of Directors. (Freeman Decl. ¶¶ 1-2; Defs.' 56.1 ¶ 4.)

1

Under the authority of the United States Small Business Administration ("SBA"), CCC was in the business of making commercial loans to small businesses. (Freeman Decl. ¶ 2.) The SBA gives licenses to very companies that are not banks to conduct this type of business. (Pl.'s 56.1 ¶ 41; Freeman Decl. ¶ 19 n.7.) In 1999, CCC and Conning Capital Corporation ("Conning") entered into an agreement whereby Conning invested approximately $12,500,000 in CCC in exchange for significant, though minority, ownership rights. (Freeman Decl. ¶ 3; Defs.' 56.1 ¶¶ 5, 7.) As part of the agreement, Conning's founder and owner, Greg Batton ("Batton"), became a member of CCC's Board of Directors. (Freeman Decl. ¶ 3; Defs.' 56.1 ¶ 6.)

Despite Conning's capital contribution, CCC did not perform well in 2000. (Defs.' 56.1 ¶ 7.) Consequently, Batton suggested to Freeman that CCC hire a Chief Credit Officer ("CCO"), who would be tasked with supervising CCC's servicing and liquidating departments. (Freeman Decl. ¶ 4.) According to Freeman, "[t]he reason for the need of additional high level executives was that Conning intended to invest a second round of financing. . . ." (Id.) Thereafter, CCC engaged an executive-recruiting firm, which in turn recommended Benoit as a potential candidate for the CCO position. (Id. ¶ 5.) Benoit was interviewed at least twice by Batton, who "wanted to assure himself that the candidates for CCO were personally reviewed by Conning as well."

2

(Id. ¶ 6.) Benoit recollected at his deposition that, at the second interview, Batton expressed that "he was not happy with what had happened since the time [Conning] put in their $12,500,000" and "indicated that the $7 million that was going to go in was a result of things not improving." (Defs.' Ex. E at 246; see Defs.' 56.1 ¶ 9.) And Freeman alleges that, during four or five "hiring meetings," he and Benoit had specific discussions about CCC's deal with Conning (the "Conning Transaction"), and that he may have even shown Benoit a letter of intent between CCC and Conning. (Defs.'s 56.1 ¶ 7; Freeman Decl. ¶ 7; Freeman Reply Decl. ¶ 6.) At one of these meetings, Benoit was offered the CCO position. (Freeman Decl. ¶ 7; Pl.'s 56.1 ¶ 32.)

Following discussions between Benoit, Batton, and Freeman about compensation and stock options, Benoit signed an employment-offer letter on February 27, 2001 (the "Employment Agreement"). (Freeman Decl. ¶ 7; Defs.' 56.1 ¶ 8; see Defs.' Ex. B.) The Employment Agreement provided that if Benoit was terminated without cause, he would be eligible for a lump-sum payment of six months of his base salary, or $90,000. (Defs.' Ex. B at 2; Defs.' 56.1 ¶ 14.) He would also "receive an option of 20,400 shares representing 2% of the fully diluted shares of [CCC], including unissued options, at the close of the current

financing transaction." (Defs.' Ex. B at 1; Defs.'s 56.1 ¶ 12.)

As it relates to this action, "Cause" was defined as:

> {4}failure to perform the duties assigned to
> you which the Company views as being
> material to the business of the Company,
> under circumstances in which you knew that
> such failure would be detrimental to the
> company, unless you remedy such failure no
> later than 30 days following delivery to you
> of a written notice from the Company
> describing such failure; or {5}your material
> breach of any written policy applicable to
> employees of the company.

(Defs.' Ex. B at 2; Defs.' 56.1 ¶ 15.)

Benoit began working at CCC on March 5, 2001. (Defs.' 56.1
¶ 11.) At that time, he signed an acknowledgement that he read
and understood the CCC Employee Handbook (the "Handbook") and
CCC's Code of Business Ethics and Standards of Conduct (the
"Code"). (Defs.' 56.1 ¶ 17.) The Handbook generally set forth
CCC's commitment to a positive work environment, including the
admonitions that "[a]ny person making unwelcome sexual advances,
requests for sexual favors and other such verbal or physical
conduct creating an intimidating, hostile or offensive working
environment may be terminated immediately" and "[w]hen an
employee's performance is unsatisfactory, or when an employee
violates the principles and practices of [CCC], appropriate
disciplinary actions may have to be taken." (Defs.' 56.1 ¶ 20,
Ex. J at 2, 3.) The Code also provided standards for suitable
work conduct, most relevantly that one should treat clients,

4

management, competitors, and coworkers according to "the highest standards of professionalism, honesty, integrity and fairness." (Id. ¶ 19, Ex. I §§ 2, 3.G.) This included exercising good judgment in business relationships, (id. ¶ 19, Ex. I § 3), avoiding the appearance of impropriety in discharging one's duties, (id.), and an obligation to protect confidential information. (Id. ¶ 19, Ex. I § 3.L.) Benoit was personally responsible for editing another document, the Loan Policy and Procedures, which "required employees to promote and maintain a favorable image of CCC and to behave professionally towards each other." (Defs.' 56.1 ¶ 21.)

In the first several months of Benoit's tenure, CCC "originated and closed several loans . . . and equally important had originated but had not closed on approximately $30 million of SBA approved and issued authorizations." (Pl.'s 56.1 ¶ 35.) As a result, Benoit estimates that approximately 50% of CCC's staff was laid off, ultimately leaving about ten employees, five of whom were part of management. (Id. But see Freeman Reply Decl. ¶ 10.) On June 6, 2001, Batton informed CCC that Conning would not be able to complete the Conning Transaction because it was acquired by another entity, which, according to Batton, altered Conning's investment strategy and rendered the Conning Transaction incongruous with its investments portfolio. (Freeman Decl. ¶ 11; Defs.' 56.1 ¶ 22.) Freeman and Benoit present

starkly different versions of what followed Conning's decision. According to Freeman, Benoit never spoke to him about his options and even "demonstrated to [Freeman] that he understood that anything concerning the Options to purchase the stock of CCC had been rendered moot because the issuance of the Options was premised on Conning's investing and consummating the [Conning Transaction]. . . ." (Freeman Decl. ¶ 13.) Benoit, on the other hand, asserts that he specifically asked Freeman about the status of his options in light of Conning's withdrawal from the Conning Transaction, that Freeman never responded by stating that the options provision was mooted or terminated, and that Freeman said that he "would do what he could to ensure" that Benoit received the options.[1] (Pl.'s 56.1 ¶ 61. But see Freeman Reply Decl. ¶ 7.)

During the remainder of 2001 and 2002, CCC attempted to salvage its business. (Freeman Decl. ¶ 14; Pl.'s 56.1 ¶¶ 37-39, 41-43.) It searched for potential acquirers or investors, which culminated in CCC's signing a letter of intent with Newtek Capital, Inc., now known as Newtek Business Services, Inc. (Freeman Decl. ¶ 14.) CCC contends that Benoit's work performance during that time was antithetical to CCC's recovery and development. (Id. ¶ 15.) For example, in the summer of

---

[1] Maria Naccarato ("Naccarato"), who also had an options provision in her employment agreement with CCC, was purportedly assured the same. (Pl.'s 56.1 ¶ 61.)

6

2002, during a regular examination of CCC by the Farm Credit Administration ("FCA"), an agent for the SBA, an FCA representative allegedly informed Freeman that Benoit had made comments to him of a negative nature about CCC's quality of leadership and about Newtek, which had applied to the SBA to acquire a majority of CCC's shares. (Id. ¶ 16; Defs.' 56.1 ¶ 24.) While the FCA representative purportedly told Freeman not to worry about Benoit's comments from a regulatory perspective, "he believed that [Freeman] should be alerted to the fact that [he] had a high-level disgruntled employee and officer who was making comments that might place CCC, [Freeman], and others in a negative light."[2] (Freeman Decl. ¶¶ 16, 18.) Freeman asserts that similar negative comments were made by Benoit to other CCC employees, leading to consternation among the staff, the loss of productive work time to "give and take between supervisors and employees about the state of CCC," and the potential to "jeopardize the effective loan collections that were necessary to keep the cash flows steady." (Id. ¶¶ 22-25.) Further, according to CCC, Benoit, in seeking employment elsewhere, relayed information to some of CCC's competitors about details of the transaction with Newtek. (Id. ¶ 19; Defs.' 56.1 ¶ 24.)

---

[2] "Others" included John Cox, who acted as an outside consultant to CCC in its negotiations with Newtek, (Cox Decl. ¶ 2), and Michael Dowd, who CCC hired to become Chief Operating Officer. (Freeman Decl. ¶¶ 16, 18.)

For Benoit's part, he claims to have positively contributed to CCC during this period of rebuilding. Benoit believed after being hired that his focus would be on ensuring credit quality of origination decisions and managing loan closings. (Pl.'s 56.1 ¶ 33.) To that end, Benoit claims that he undertook to capture data on over 600 separate loans, and after establishing a risk-rating system with respect to those loans, CCC was in a better position to present the portfolio-risk attributes to potential investors and acquirers. (Id. ¶ 38.) In addition to preparing projections and information to aid the negotiations, Benoit states that he participated directly in negotiations with one potential investor. (Id. ¶¶ 41-42.) He also alleges that he sold SBA authorizations to other lenders for a profit. (Id. ¶ 37.) Benoit contends that Freeman never said anything to him about any of his alleged transgressions as a CCC employee. (Id. ¶ 54.) Moreover, he denies making negative comments to the FCA representative, arguing that "[p]assing the FCA exam was an important component in obtaining SBA approval for the Newtek deal . . . [a]nd since the primary reason for plaintiff staying on was the options, it didn't make sense for plaintiff to undermine the deal." (Id. ¶ 55.) With respect to negative statements about Newtek, Benoit asserts that because he never met its management, he would not have had a basis to comment negatively about them. (Id. ¶ 56.) Though Benoit believed CCC's

intent was clear to move forward without him -- Newtek personnel
were brought into CCC, (id. ¶¶ 44-45, 48-49), and Benoit was
"specifically uninvited" by Freeman to a meeting with the FCA,
(id. ¶ 47; Freeman Reply Decl. ¶ 12) -- he was nevertheless
motivated by the options. (Pl.'s 56.1 ¶ 56.) Benoit adds that
he did seek employment elsewhere "[a]fter being purposely
excluded from the FCA and the Newtek negotiations," but did not
recall mentioning CCC in those conversations "[o]ther than
noting that he had been excluded from meetings that he felt he
should have attended. . . ." (Id. ¶ 50.)

CCC further cites to instances of Benoit engaging in
hostile exchanges with coworkers. (Defs.' 56.1 ¶ 24.) In
addition to questioning the capabilities of senior management in
the presence of CCC employees, (Freeman Decl. ¶ 18), and
referring to Freeman as a "ghost in the corner office," (Defs.'
56.1 ¶ 25), Benoit had alleged incidents with subordinates.
(Id.; Freeman Decl. ¶ 20.) First, Renee Erny ("Erny"), the
Office Manager and Director of Human Resources, "indicated that
Mr. Benoit had inappropriately touched her and made sexually
harassing remarks to her." (Freeman Decl. ¶ 20; see Defs.' Ex. H
at 48-49.) Second, Erny reported that Benoit was derogatory and
abusive to David Hernandez ("Hernandez"), CCC's Director of
Servicing under Benoit's chain of command, on the basis of
Hernandez's sexual orientation, thereby creating a hostile work

environment. (Freeman Decl. ¶ 21; see Defs.' Ex. H at 57-60.)

Neither Erny nor Hernandez initiated a formal action against

Benoit. (Freeman Decl. ¶¶ 20-21.) Benoit denies Erny's

allegations that he sexually harassed her and that he acted

inappropriately toward Hernandez.[3] (Pl.'s 56.1 ¶¶ 58-59.)

Freeman ultimately terminated Benoit for cause on October

16, 2002.[4] (Defs.' 56.1 ¶¶ 26-27; Pl.'s 56.1 ¶ 53.) According to

Freeman:

> I felt that I could, in my judgment as Chief
> Executive Officer, both in general and
> weighing the dictates of the [Handbook], the
> [Code], and the Loan Policy and Procedures
> (which also governed employee conduct), no
> longer tolerate Mr. Benoit's insubordinate,
> unprofessional, disruptive, and unethical
> conduct. Accordingly, pursuant to
> procedures under CCC's company policies, and
> the fifth "cause" provision of his
> [Employment] Agreement, which expressly did
> not require notice and an opportunity to
> cure, I terminated Mr. Benoit for cause.

(Freeman Decl. ¶ 26.) On December 31, 2002, Newtek acquired CCC

pursuant to an acquisition agreement. (Defs.' 56.1 ¶ 28.)

Freeman thereafter learned from Newtek that Benoit had taken "no

steps to file with the SBA claims for reimbursement of CCC's

legal expenses on loans in liquidation or in foreclosure, which

---

[3] Benoit claims that he served as a confidant to Hernandez following an
incident between Hernandez and other CCC employees. Thus, concludes Benoit,
"[i]t is hard to believe that [Hernandez] would talk to plaintiff about this
if plaintiff were harassing him, or allowed him to be harassed." (Pl.'s 56.1
¶ 59.)

[4] Benoit states that Naccarato also was terminated for cause and denied
severance. (Pl.'s 56.1 ¶ 53.)

10

would have likely resulted in almost two million dollars of cash being accounted for on CCC's books as a potential asset in 2001 and 2002." (Freeman Decl. ¶ 28; see generally Cox Decl.) Freeman believes that Benoit now attempts to narrow the scope of his duties at CCC, (see Pl.'s 56.1 ¶ 33), "to absolve himself of responsibility for his failures, which, as Newtek recently learned, resulted in specific monetary losses that could have been recovered from the [SBA]." (Freeman Reply Decl. ¶ 9.)

As a result of his for-cause termination, Benoit did not receive the $90,000 severance payment, (Freeman Decl. ¶ 29; Pl.'s 56.1 ¶ 53), which forms the basis of one of the parties' disputes in this action (the "Severance Claim"). Defendants point to the language of the fifth for-cause provision -- "material breach of any written policy applicable to employees of the company" -- as grounds for terminating Benoit without the concomitant severance. Benoit argues that applicability of this provision presents a triable issue of fact. The parties also disagree over the meaning of "the current financing transaction" in the Employment Agreement as it relates to whether Benoit should receive stock options (the "Options Claim"). Benoit believes that he was entitled to exercise the stock options whenever CCC obtained capital financing, which it ultimately did receive from Newtek. (Pl.'s 56.1 ¶ 61.) Defendants counter that the options were premised upon consummation of the Conning

Transaction, not any general future capital financing. (Freeman Decl. ¶ 13.)

The complaint in this action, consisting of one cause of action for breach of contract, was filed on July 18, 2003. Following the completion of discovery, defendants now move the Court for summary judgment dismissing Benoit's complaint, or alternatively, for partial summary judgment related to the Options Claim. Defendants also seek leave to amend their answer, pursuant to Federal Rule of Civil Procedure 15(a), to add counterclaims sounding in breach of the implied covenant of good faith and fair dealing and breach of fiduciary duty.[5]

## Discussion

### I. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure allows for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The

---

[5] Because of a filing error, the Court did not receive timely opposition papers from plaintiff. Nevertheless, the Court will not strike plaintiff's opposition as defendants request. Defendants suffered no prejudice from the error, particularly in view of the fact that they timely received a courtesy copy of plaintiff's opposition and submitted a reply thereto. Cf. Minitti v. Speiser, Krause, Nolan & Granito, P.C., Nos. 04 Civ. 7976, 05 Civ. 2210, 2006 U.S. Dist. LEXIS 91986, at *33 n.6 (S.D.N.Y. Dec. 19, 2006) (denying motion to strike untimely reply papers because it was "unclear why any [prejudice] would result from the late filing of reply papers to which [the moving party] had no right of rejoinder").

party moving for summary judgment bears the "heavy burden" of demonstrating that no genuine issue as to any material fact exists and that it is therefore entitled to judgment as a matter of law. Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999); accord Atl. Mut. Ins. Co. v. CSX Lines, L.L.C., 432 F.3d 428, 433 (2d Cir. 2005) ("'The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment . . . .'") (quoting Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004)); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994) (Kearse, J.). Nonetheless, summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

A district court "must resolve all ambiguities and draw all inferences in favor of the non-moving party," such that "[i]f there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 145 (2d Cir. 2002); accord Brown v. Cara, 420 F.3d 148, 152 (2d Cir. 2005) ("We will affirm the District Court's grant of summary judgment

13

to defendants only if, based on facts not in genuine dispute and drawing all inferences in favor of plaintiffs, defendants are entitled to judgment on the merits as a matter of law."). The relevant substantive law will identify the facts that are material for the purposes of summary judgment.[6] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Of course, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991) (quoting Anderson, 477 U.S. at 247-48). "A dispute as to a material fact is 'genuine,' and hence summary judgment is not appropriate, under this standard, only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248); accord N.Y. Stock Exch., Inc. v. New York, N.Y. Hotel LLC, 293 F.3d 550, 554 (2d Cir. 2002). "[T]he law provides no magical talisman or compass that will serve as an unerring guide to determine when a material issue of fact is presented. As is so often true in the law, this is a matter of informed and properly reasoned judgment." Am. Mfrs. Mut. Ins.

---

[6] The Court will apply New York substantive law because this case arises under diversity jurisdiction, 28 U.S.C. § 1332(a)(1). See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 71-80 (1938). And where, as here, the parties rely solely upon New York law, choice of law is established by implied consent. See Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000).

14

Co. v. Am. Broadcasting-Paramount Theatres, Inc., 388 F.2d 272, 279 (2d Cir. 1967).

II.   The Severance Claim

In the typical breach-of-contract action brought by a discharged employee against his former employer, the parties' dispute centers on whether the employment relationship was at will. See, e.g., Hoerner v. Metro. Life Ins. Co., No. 98 Civ. 4210, 2001 U.S. Dist. LEXIS 2914, at *7-10 (S.D.N.Y. Mar. 21, 2001) (Mukasey, J.). An at-will relationship, the hallmark of which is the lack of a fixed duration of employment, is terminable at any time by either employer or employee. See Mycak v. Honeywell, Inc., 953 F.2d 798, 801 (2d Cir. 1992) (quoting Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 333, 506 N.E.2d 919, 920 (N.Y. 1987)). Here, the Employment Agreement contemplates an indefinite period of time for Benoit's employment. (Defs.' Ex. B at 2.) Indeed, Benoit "concedes that he was an at-will employee." (Pl.'s Memo. of Law at 6.) Nevertheless, "when the employer has promulgated policies . . . specifying procedures or grounds for termination[, t]hese procedures become a part of the employment contract and must be followed." Mycak, 953 F.2d at 801; see Gorrill v. Icelandair/Frugleidir, 761 F.2d 847, 851 (2d Cir. 1985) ("[T]he at-will discharge rule does not apply where there is 'an express limitation in the individual contract of employment'. . . .")

(quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 305, 448 N.E.2d 86, 91 (N.Y. 1983)); Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 465, 443 N.E.2d 441, 445 (N.Y. 1982) (establishing the principle that at-will discharge may be subject to contractual limitations). CCC does not dispute that the Employment Agreement set out express limitations on its ability to terminate Benoit. Instead, CCC argues that Benoit's termination was carried out in accordance with the fifth for-cause provision of the Employment Agreement, thereby making Benoit's Severance Claim meritless.

Whether CCC adhered to the fifth for-cause provision[7] in terminating Benoit is a question of fact unsuitable for disposition on summary judgment. That provision permitted for-cause termination where there was a "material breach of any written policy applicable to employees of the company." (Defs.' Ex. B at 2.) Defendants point to several instances of Benoit's conduct which they believe were material breaches of the Handbook, Code, or Loan Policy and Procedures. For example, Benoit allegedly made unauthorized negative comments about CCC to an FCA representative, disparaged incoming Newtek management,

---

[7] The fourth for-cause provision, related to detrimental work performance, requires written notice to the employee. Because CCC never issued any notice to Benoit, he argues that this provision could not have formed the basis for his for-cause termination. (Pl.'s Memo. of Law at 6-7.) CCC implicitly acknowledges this by solely arguing that it properly terminated Benoit for cause and without notice. (Defs.' Reply Memo. of Law at 5-6.) Accordingly, the Court only considers the fifth for-cause provision in this Opinion and Order.

16

relayed information about Newtek's acquisition of CCC to competitors, and harassed Erny and Hernandez. Benoit generally denies all of these allegations, arguing that his termination was the result of financial considerations following CCC's transaction with Newtek. (Pl.'s Memo. of Law at 7, 9.) Viewing the evidence in a light favorable to the non-moving party, Benoit has raised a genuine issue of material fact as to whether his termination was for cause pursuant to the Employment Agreement. See Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1022 (2d Cir. 1985) (Kearse, J.) (finding issues of fact to be tried where the parties presented contrasting evidence bearing on whether plaintiff's termination was for cause); Defontes v. Mayflower Inn, Inc., No. 06 Civ. 1126, 2007 U.S. Dist. LEXIS 88375, at *9-10 (D. Conn. Dec. 3, 2007) ("Given the fact that [plaintiff] was never told why he was fired and that . . . [defendant] never complained about his performance or warned him about any deficient performance, a jury could well decide to credit [plaintiff's] version of events and discredit the [defendant's]."); McCabe v. Quiet Man, Inc., 01 Civ. 5055, 2006 U.S. Dist. LEXIS 31376, at *26 (S.D.N.Y. May 19, 2006) (denying summary judgment where "the question of whether Plaintiff engaged in the activity Defendants allegedly instructed him to stop is hotly disputed").[8]  Moreover, Benoit

---

[8] Defendants maintain that summary judgment is appropriate because an employer

17

admits to calling Freeman a "ghost in the corner office," but whether this isolated insult was a material breach of CCC policy warranting for-cause termination is also a question of fact to be determined by a jury. Accordingly, defendants' motion for summary judgment is denied with respect to the Severance Claim.

III. The Options Claim

Summary judgment is more appropriate for the Options Claim because the construction and interpretation of a contract presents a question of law. See Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582, 305 F.3d 82, 85 (2d Cir. 2002). As stated above, the Employment Agreement promised Benoit "an option for 20,400 shares representing 2% of the fully diluted shares of [CCC], including unissued options, at the close of *the current financing transaction*." (Defs.' Ex. B at 1 (emphasis added).) The parties dispute the meaning of "the current financing transaction." Defendants maintain that the term unequivocally refers to the Conning Transaction because no other financing transactions existed or were contemplated at the time of the Employment Agreement. (Defs.' 56.1 ¶ 13.) Moreover,

_____

"need only believe in good faith the allegations against an employee, regardless of whether the allegations are true." (Defs.' Memo. of Law at 11 (internal quotation omitted).) In support of this proposition, defendants cite a case brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., in which the Court found that summary judgment was appropriate where "the incontrovertible evidence shows that defendants *believed* in good faith" that plaintiff had sexually harassed a subordinate. Agugliaro v. Brooks Bros., Inc., 927 F. Supp. 741, 747 (S.D.N.Y. 1996) (emphasis in original). This standard is inapplicable to the Court's summary-judgment determination in this breach-of-contract action.

18

Freeman asserts that he "made it clear to Mr. Benoit that the
Conning Financing Transaction was the only 'financing
transaction' referred to in the [Employment] Agreement, and that
the 'financing transaction' referred to in the [Employment]
Agreement had to be consummated by Conning in order for Mr.
Benoit to receive the stock option rights . . . ." (Freeman
Decl. ¶ 9; see Defs.' 56.1 ¶ 10; Freeman Reply Decl. ¶¶ 3-5.)
Benoit maintains that the Employment Agreement "intentionally
refers to 'the current financing transaction' in order to leave
it open ended as it could be a different financing transaction
which provides CCC with the necessary capital." (Pl's 56.1
¶ 61.)

In construing the terms of the Employment Agreement, the
Court's goal is to give effect to the parties' intentions. See
Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,
7 F.3d 1091, 1094 (2d Cir. 1993); Sutton v. E. River Sav. Bank,
55 N.Y.2d 550, 555, 435 N.E.2d 1075, 1078 (N.Y. 1982) ("[I]n
searching for the probable intent of the parties, lest form
swallow substance, our goal must be to accord the words of the
contract their fair and reasonable meaning.") (internal
quotations omitted). The first question this Court must answer
is whether the Employment Agreement was unambiguous, and thus
whether the Court will interpret the meaning of the contract
based on "the terms expressed in the instrument itself" rather

than with the aid of extrinsic evidence as to the parties' intent in drafting the agreement at issue. Faulkner v. Nat'l Geographic Soc'y, 452 F. Supp. 2d 369, 375 (S.D.N.Y. 2006) (quoting Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990)). Under New York law, "[a]scertaining whether or not a writing is ambiguous is a question of law for the trial court." Sayers, 7 F.3d at 1094. "A contract is ambiguous where reasonable minds could differ on what a term means, but no ambiguity exists where the alternative construction would be unreasonable." Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996) (internal citations omitted); see Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (Kearse, J.) (finding unambiguous a contract that has "'definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1283 (N.Y. 1978)). In that light, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992); see also Hunt Ltd., 889 F.2d at 1277.

20

The terms "the" and "current" as used in the Employment
Agreement are unambiguous. Webster's Dictionary describes "the"
as "used as a function word to indicate that a following noun or
noun equivalent refers to someone or something previously
mentioned or clearly understood from the context or the
situation." Webster's Third New Int'l Dictionary 2368 (1981).
Thus, "the" preceding "current financing transaction" suggests a
clearly understood financing transaction, rather than any
financing transaction that might come to pass. Use of the term
"current," which is defined as "presently elapsing" and
"occurring in or belonging to the present time," id. at 557,
removes any remaining ambiguity. Courts in several
jurisdictions have found the word "current" to be unambiguous in
various contexts. See Adzick v. UNUM Life Ins. Co. of Am., 351
F.3d 883, 888 (8th Cir. 2003) (citing Webster's Dictionary in
finding that the plain meaning of "current" was not ambiguous in
an insurance policy application); Carland v. Metro. Life Ins.
Co., 935 F.2d 1114, 1120 (10th Cir. 1991) (affirming summary
judgment in favor of a life-insurance beneficiary in a case
related to wrongful denial of insurance proceeds after
determining, *inter alia*, that "current value" could only mean
the value of the policy at the time of the policy-holder's
death); Dayco Corp. v. W.H. Brady Co., 787 F.2d 589, 589 (6th
Cir. 1986) (deeming the contract provision "current catalog

price" unambiguous). In the instant context, placing "current"

after "at the close of the" clearly portrays an ongoing

financing transaction which CCC anticipated would close. In

sum, "the current financing transaction" unambiguously refers to

a particular financing transaction occurring simultaneously with

the formation of the Employment Agreement.

Benoit, on the other hand, contends that the Employment

Agreement entitled him to exercise the stock options "upon CCC

obtaining new capital financing, which it did from Newtek,"

(Pl.'s Memo. of Law at 4), nearly two years later. This is an

unreasonable interpretation of the Employment Agreement because

Benoit's proposed interpretation of "the current financing

transaction" renders the terms "the" and "current" meaningless.[9]

"A contractual provision should be read so as to avoid rendering

any part of the contract superfluous or without effect." Omni

---

[9] The Court would be more inclined to deem the Employment Agreement ambiguous
if there were more than one "current financing transaction" contemplated by
CCC at the time Benoit was hired and if the parties disputed which of those
transactions was the subject of the Employment Agreement. That is not the
case here, where defendants claim that the relevant transaction was the
Conning Transaction, whereas Benoit implausibly argues that the transaction
was any financing transaction, including the ultimate transaction with
Newtek. See Readco, Inc., 81 F.3d at 299 ("[N]o ambiguity exists where the
alternative construction would be unreasonable."). Further, assuming
arguendo that CCC's failure to specify the Conning Transaction as such
created ambiguity, extrinsic evidence wholly supports the fact that the
Conning Transaction was the only financing transaction contemplated by CCC
when Benoit was hired. (See Defs.' Ex. E at 246, 305-06.) See Faulkner, 452
F. Supp. at 375 ("Summary judgment is appropriate also 'when the language [of
the contract] is ambiguous and there is relevant extrinsic evidence, but the
extrinsic evidence creates no genuine issue of material fact and permits
interpretation of the agreement as a matter of law.'") (quoting Nycal Corp.
v. Inoco PLC, 988 F. Supp. 296, 299 (S.D.N.Y. 1997)).

22

Berkshire Corp. v. Wells Fargo Bank, N.A., 307 F. Supp. 2d 534,
540 (S.D.N.Y. 2004); see Newmont Mines Ltd. v. Hanover Ins. Co.,
784 F.2d 127, 135 (2d Cir. 1986) ("Unless otherwise indicated,
words should be given the meanings ordinarily ascribed to them
and absurd results should be avoided."). As defendants point
out, (Defs.' Reply Memo. of Law at 7 n.4), if Benoit could have
received stock options at the close of any financing transaction
involving CCC at any point in time, the Employment Agreement
would not use the words "the current financing transaction," but
might instead refer to "a financing transaction" or "any
financing transaction." Benoit's attempted application of "the
current financing transaction" to an inchoate transaction must
fail; therefore, the Options Claim is dismissed.[10]

IV.  Leave to Amend the Answer

Defendants also move, under Federal Rule of Civil Procedure
15(a), for leave of Court to assert counterclaims in their
answer for breaches of the implied covenant of good faith and
fair dealing and of Benoit's fiduciary duty as CCO. Under Rule

---

[10] A subsidiary issue to the Options Claim, only relevant if the claim
survives summary judgment, is the valuation of the options. According to
Newtek's in-house corporate counsel, "[h]ad plaintiff continued to own the
CCC options, and had he exercised them prior to the Acquisition, he would
have received 1,146 shares of [Newtek] . . . [which] would today be valued at
approximately $2,108." (Ash Decl. ¶ 5.) Benoit's computation, on the other
hand, is based upon the $5 million net capital requirement by the SBA for
CCC. Under the Employment Agreement, Benoit concludes that he is entitled to
at least 2% of the $5 million, or $100,000. (Pl.'s 56.1 ¶ 63. But see Freeman
Reply Decl. ¶ 16.) Because the Options Claim is dismissed as discussed
below, this issue is moot.

23

15(a), a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has followed the U.S. Supreme Court's direction that permission to amend a claim "should be freely granted." Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252 (2d Cir. 1991) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). Notwithstanding this liberal standard, a court may deny leave to amend where there has been undue delay or bad faith on the moving party's part, prejudice to the non-movant, or where leave would be futile. See Monahan v. New York City Dep't of Corr., 214 F.3d 275, 283 (2d Cir. 2000) (citing Foman, 371 U.S. at 182).

Defendants' proposed counterclaim alleging Benoit's breach of the implied covenant of good faith and fair dealing is futile. Under New York law, no such implied covenant applies to at-will employment contracts. In Nunez v. A-T Fin. Info., Inc., Judge Preska dismissed an employee's claim asserting breach of the covenant of good faith and fair dealing by her employer, finding that:

> Every contract (other than an agreement for employment at will) under New York law includes "an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." In an employment at will contract, however, either party has the right to take the ultimate step to render performance impossible, because either party can terminate the relationship, at any time,

> for any reason. Under the circumstances, to
> imply a lesser obligation not to obviate
> performance other than by discharging the
> employee would be patently illogical.

957 F. Supp. 438, 443 (S.D.N.Y. 1997) (quoting Grad v. Roberts,
14 N.Y.2d 70, 75, 198 N.E.2d 26, 28 (N.Y. 1964)); see also
Boritz v. Fin. Info. Servs. Agency, No. 94 Civ. 5059, 1995 U.S.
Dist. LEXIS 11063, at *10 (S.D.N.Y. Aug. 4, 1995) ("Well-settled
New York law, however, holds that no implied covenant of good
faith and fair dealing attaches to at-will employment contracts
governed by New York law."). Here, although the employer seeks
to bring the claim against the employee, the principle remains
the same. Under the Employment Agreement, Benoit could resign
at any time for any reason, providing him with "the right to
take the ultimate step to render performance impossible." Nunez,
957 F. Supp. at 443. As such, imposing an implied covenant of
good faith and fair dealing on him "would be inconsistent with
other terms of the contractual relationship." Sabetay, 69 N.Y.2d
at 335, 506 N.E.2d at 922. Accordingly, defendants' motion for
leave to add this counterclaim is denied.

On the present record, the Court cannot conclude that a
breach-of-fiduciary-duty claim would be futile. The elements of
such a claim under New York law are: (1) the existence of a
fiduciary relationship between the parties; and (2) a breach of
the fiduciary duty. See Cramer v. Devon Group, Inc., 774 F.

Supp. 176, 184 (S.D.N.Y. 1991) (Leisure, J.). As to the first element, it is well settled in New York that an employee owes a fiduciary duty to an employer in the performance of the employee's duties. See Slue v. New York Univ. Med. Ctr., 409 F. Supp. 2d 349, 373 (S.D.N.Y. 2006) (emphasis omitted) (quoting Wallack Freight Lines, Inc. v. Next Day Express, Inc., 273 A.D.2d 462, 463, 711 N.Y.S.2d 891, 891 (2d Dep't 2000)). The second element is in dispute. For example, Benoit argues, in opposition to allegations that he failed to collect reimbursements from the SBA, that it was not solely his duty to complete this task. He also points to all of the positive contributions he made to CCC during the company's difficult period in 2001 and 2002. (Pl.'s Memo. of Law at 10-14.)

Without futility and with no evidence of bad faith by defendants, Benoit's only viable argument in opposition to defendants' motion for leave to amend is that he "has been prejudiced by not conducting discovery knowing that he was subject to a $900,000 claim. Such knowledge would have altered the scope of plaintiff's discovery." (Id. at 14.) This is a close issue. In Benoit's favor, defendants have not offered any justification for the long delay in seeking to amend their answer. See Evans v. Syracuse City Sch. Dist., 704 F.2d 44, 47 (2d Cir. 1983) ("The longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a

showing of prejudice.") (internal quotations and citation
omitted). Additionally, the Second Circuit has held that
allowing a proposed amendment after the completion of discovery
and the filing of a summary judgment motion causes prejudice to
the non-moving party. Ansam Assoc., Inc. v. Cola Petroleum,
Ltd., 760 F.2d 442, 446 (2d Cir. 1985). In that case, however,
the Court was influenced by the District Court's finding that
the newly proposed claims "'allege an entirely new set of
operative facts of which it cannot be said that the original
complaint provided fair notice.'" Id.; see also Martell v.
Boardwalk Enters., Inc., 748 F.2d 740, 749 n.2 (2d Cir. 1984)
(Kearse, J.) (affirming district court's denial of motion to
amend answer where the newly proposed affirmative defense "could
well have injected new issues" into the case). Here,
defendants' proposed amendment to its answer does not call for a
new set of facts, but rather largely stems from the discovery
that has already occurred. Indeed, Benoit does not specify how
the scope of his discovery would have changed, instead
extensively arguing that the established facts do not support
defendants' proposed claim. In so doing, he has not shown
prejudice, but has "created, in effect, a miniature motion for
summary judgment." Lopez v. John Hancock Mut. Life Ins. Co., 115
F.R.D. 316, 317 (S.D.N.Y. 1987) (Leisure, J.). The briefing on
that motion may be incomplete, depending on whether Benoit and

defendants need to conduct additional discovery. Based upon the present record, however, the Court does not believe that a significant amount of additional discovery, if any, will be needed. See Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc., 01 Civ. 3796, 2005 U.S. Dist. LEXIS 14937, at *14 (S.D.N.Y. July 26, 2005) (Leisure, J.) ("Courts determine whether prejudice would result from a proposed amendment by deciding whether the amendment would require significant additional resources to conduct discovery and prepare for trial or significantly delay resolution of the dispute."). Finding no prejudice to Benoit, the Court grants defendants' motion to amend its answer to add a counterclaim for breach of fiduciary duty. This ruling is without prejudice to Benoit's right to move for summary judgment following any limited discovery.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to the Options Claim and DENIED as to the Severance Claim. Further, defendants' motion for leave to amend their answer is GRANTED IN PART and DENIED IN PART. The parties are ORDERED to appear before this Court at 500 Pearl Street, Courtroom 18B for a status conference on October 2, 2008 at 10:00 a.m. If the parties intend to engage in additional limited discovery, they should submit a revised case management plan in advance for the Court's approval.

**SO ORDERED.**

**New York, New York**
August 25 , 2008

_____

U.S.D.J.

Copies of this Opinion and Order have been sent to:

Robert J. Barsch, Esq.
60 East 42nd Street, Suite 2501
New York, NY 10017

Robert M. Brill, Esq.
880 3rd Avenue, 13th Floor
New York, NY 10022